## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**KEITH A. WASHINGTON,**      *

     **Petitioner**      *

                          **CIVIL NO. _____**

     **v.**      *

                          **(Case No. CT 07-1664X,**

**DENISE GELSINGER, WARDEN,** *et al.,*    *      **Circuit Court for Prince George's**

**Maryland Correctional Institution**              **County, Maryland)**

**18601 Roxbury Road**      *

**Hagerstown, MD 21746**             **(No. 1645, Sept. Term, 2013,**

                       *      **Court of Special Appeals of**

                          **Maryland)**

                   *

     *   *   *   *   *

## MEMORANDUM IN SUPPORT OF PETITION UNDER 28 U.S.C. § 2254
## FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

Petitioner, Keith A. Washington, through undersigned counsel, Daniel H. Ginsburg, Esq., and The Law Office of Daniel Ginsburg, LLC, submits this Memorandum in Support of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By A Person In State Custody.

### I.  INTRODUCTION

Following a jury trial in the Circuit Court for Prince George's County, Maryland, Petitioner was convicted of:  involuntary manslaughter (unlawful act) and first-degree assault of Brandon Clark; first-degree assault of complaining witness Robert White; and two counts of use of a handgun in the commission of a felony.  Petitioner was acquitted, however, of his remaining charges, including second-degree murder and voluntary manslaughter.

At trial, Petitioner testified that he was repeatedly punched and kicked by Clark and White, who had delivered furniture to his house.  Specifically, Petitioner explained that White initiated the violent encounter by punching Petitioner in the side of his face, while Clark punched Petitioner in

1

the back of the head.  *Washington v. State*, 191 Md. App. 48, 58-65, *cert. denied*, 415 Md. 43 (2010)

(statement of facts from Petitioner's direct appeal).  Next, as Petitioner tried to cover up his head and

face, the deliverymen repeatedly hit and kicked him in the back of his head, neck and back.  *See id.*

Petitioner, an off-duty police officer, stated that he feared the deliverymen, who were much bigger

than him, would beat him to death or knock him unconscious, thereby obtaining access to his gun.

Consequently, Petitioner shot the deliverymen in self-defense.

In contrast, White, the State's only eyewitness, claimed that the deliverymen did not assault

Petitioner and that he shot them in anger while they were retreating from his house.  Therefore, the

jury was required to resolve the hotly disputed issues of whether the deliverymen assaulted Petitioner

and whether they were the physical aggressors.  The jury never learned, however, that White had

previously been convicted of violent crimes including pointing a firearm (1994), assault and battery

(1995), assault with intent to commit sexual conduct (1995), and domestic violence (2005).  Under

Maryland law at the time of Petitioner's trial, these convictions were clearly admissible to prove that

White attacked Petitioner and that White was the physical aggressor.  *See, e.g., Sessoms v. State*, 357

Md. 274, 291 (2000) (quoting, with approval, *State v. Garfole*, 76 N.J. 445, 452-53 (1978) ("[W]hen

the defendant is offering [other crimes evidence] exculpatorily, prejudice to the defendant is no

longer a factor, and **simple relevance to guilt or innocence should suffice as the standard of**

**admissibility**, since ordinarily . . . an accused is entitled to advance any evidence which may

rationally tend to refute his guilt or buttress his innocence of the charge made.")).  (Emphasis added).

Yet, Petitioner's trial counsel did not argue that White's convictions for violent crimes were

admissible for these purposes because counsel was ignorant of settled law.

Specifically, the Maryland Court of Special Appeals found, on collateral review, that "**trial**

**counsel misinterpreted Rule 5-404** as permitting the admission of appellant's [Petitioner's] prior

2

violent crimes or acts if appellant [Petitioner] introduced White's prior convictions for the purpose of proving he was the first aggressor." *Keith A. Washington v. State*, No. 1645, Sept. Term, 2013, 36 (filed Aug. 31, 2018) (emphasis added).  (Exhibit A).[1]  In other words, the Court determined that trial counsel failed to introduce White's prior convictions because of an **"unjustified"** fear that, under Maryland Rule 5-404(a), the State would be allowed to rebut evidence of White's violent character with evidence of Petitioner's alleged character for violence.  (Exhibit A at 37) ("From our review of Rule 5-404(a) at the time appellant was tried, **it is clear that trial counsel's fear of opening the door** to evidence pertaining to appellant's [Petitioner's] character for violence **was unjustified**") (emphasis added).

Petitioner was denied a fair trial due to his counsel's failure to introduce White's prior convictions for violent crimes to prove that he had a violent nature and was the aggressor.  Without this highly probative information concerning White's history, the jury could not reliably determine whether White was the aggressor and whether his claim that he never assaulted Petitioner squared with White's propensity for violence.

Even though the Court of Special Appeals found that trial counsel did not seek admission of White's convictions to establish his violent nature and status as the aggressor because counsel "misinterpreted Rule 5-404" in an "unjustified" manner, the Court did not conclude that counsel performed deficiently.  Under 28 U.S.C. § 2254(d)(1) (2019), this finding was "contrary to . . . clearly established Federal law" and constituted an "unreasonable application" of the test for ineffective assistance of counsel that is set forth in *Strickland v. Washington,* 668 U.S. 668 (1984). The Supreme Court has consistently held that, when a defense attorney's decision is based on an

---

[1]  The relevant portions of the opinion of the Court of Special Appeals on collateral review are attached as Exhibit A.

unreasonable mistake of law, such a decision constitutes deficient performance and may not be justified as "strategy." *See, e.g., Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986); *Williams v. Taylor*, 529 U.S. 362, 395 (2000); *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014).  Because counsel's "misinterpretation" of the "clear" language of Rule 5-404(a) at the time of Petitioner's trial was "unjustified" (Exhibit A at 37), counsel's decision, **which was grounded in counsel's error concerning settled law**, plainly constituted deficient performance under *Strickland.*  The contrary finding by the Court of Special Appeals was objectively unreasonable.

Furthermore, the application of the prejudice prong of *Strickland* by the Court of Special Appeals was unreasonable under 28 U.S.C. § 2254(d)(1).  The Court speculated, based on the jury's general verdict of "not guilty" on charges of second-degree murder and voluntary manslaughter, that the jury discounted White's testimony.  (Exhibit A at 38-39).  Furthermore, the Court divined, from the jury's verdict, that "it believed that White was the initial aggressor but found that appellant [Petitioner] did not use a reasonable amount of force in defending himself."  (Exhibit A at 39).

The jury, which is presumed to have followed the trial judge's instructions, convicted Petitioner of first-degree assault of Clark based on a finding that Petitioner "intentionally caused serious physical injury" to him.  (See excerpts, which are attached as Exhibit B, from trial transcript of February 21, 2008, at 26.)[2]  In contrast, the jury acquitted Petitioner of second-degree murder, which required proof of an "intent to kill" or an "intent to inflict such serious bodily harm that death would be the likely result," as well as voluntary manslaughter, which is "an intentional killing, which would be murder" but for the defendant acting in hot-blooded response to legally adequate

---

[2]  The finding that Petitioner committed a first-degree assault of Clark also supported Petitioner's conviction of involuntary manslaughter (unlawful act).  In his jury instructions, the trial judge defined involuntary manslaughter (unlawful act) as a killing during the commission of a first-degree assault.  (Exhibit B at 30).

provocation.  (Exhibit B at 27).  Therefore, the jury likely acquitted Petitioner of those greater

charges based on a finding that he lacked the more elevated *mens rea* of an "intent to kill" or an

"intent to inflict such serious bodily harm that death would be the likely result."  (*See id.* at 27).

Given that Petitioner's charges required proof of different gradations of intent, there is a "reasonable

probability" that the jury, unaware of White's violent convictions due to trial counsel's

ineffectiveness, believed White's account that Petitioner shot the deliverymen without physical

provocation and found that Petitioner "intentionally caused serious physical injury," but lacked a

more culpable mental state.  *See Strickland*, 668 U.S. at 694 (defining prejudice prong of test for

ineffective assistance of counsel).  Consequently, the Court of Special Appeals unreasonably applied

*Strickland* by guessing, based on the jury's verdict, that it discounted White's testimony.  Also, the

Court overlooked the "reasonable probability" of a compromise verdict, in which jurors disagreed

whether White or Petitioner was the physical aggressor and thus reached a middle ground by

convicting Petitioner of lesser charges.  *See id.*

Moreover, nothing about the jury's general verdict permitted the Court of Special Appeals

to speculate wildly that the jury believed that White was the initial aggressor in the encounter, but

that Petitioner used excessive force.  As the jury did not make specific findings of fact about

Petitioner's claim of perfect self-defense, there is a "reasonable probability" that the jury, unaware

of White's violent convictions because of trial counsel's ineffectiveness, believed White's story that

Petitioner was the physical aggressor and thus rejected Petitioner's self-defense claim.  *See id.*;

*Christian v. State*, 405 Md. 306, 324 n.14 (2008) (stating that, in order for defendant to have acted

in self-defense, he "must not have been the aggressor or provoked the conflict") (citation omitted).

Under these circumstances, there is a "reasonable probability" that, but for trial counsel's deficient

failure to introduce White's convictions to show his violent nature, the jury would have found that

White violently attacked Petitioner and that Petitioner reasonably defended himself, thereby changing the outcome of the trial.  *See Strickland*, 668 U.S. at 694.  In short, the Court of Special Appeals grossly misapplied *Strickland* by divining a lack of prejudice from the jury's general verdict, where, due to the deficient performance of Petitioner's counsel, the jury was deprived of exculpatory information about White's violent history and thus was not positioned to judge fairly whether Petitioner was attacked and placed in reasonable fear for his life.

## II.  APPLICABLE LAW

### A.  Standard for Writ of Habeas Corpus

The federal habeas statute, 28 U.S.C. § 2254, sets forth a "highly deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997).  Nevertheless, "deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Section 2254 states, in pertinent part:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2) (2019).

Under 28 U.S.C. § 2254(d)(1), a State court ruling is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law . . .."  *Williams*, 529 U.S. at 405.  This means that "the state court's decision must

be substantially different from the relevant precedent of [the Supreme] Court." *Id.* "[A] state court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Id.*

The "unreasonable application" prong of subsection (d)(1), in turn, allows a federal court to grant habeas relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413 (emphasis added). Therefore, "a federal court may grant relief when a state court has misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (internal quotation marks and citations omitted). In order to meet this standard, the State court's application of the controlling legal principle must have been "objectively unreasonable," which means "more than incorrect or erroneous." *Id.* (citing *Williams*, 529 U.S. at 409). Although some additional increment of error is required, "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks and citation omitted).

Lastly, 28 U.S.C. § 2254(d)(2) permits a federal court to grant habeas relief if the State court ruling "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." Where a state court has "misconstrued or misstated the record" on a material issue or "overlooked" evidence central to the petitioner's allegation, the Supreme Court has granted relief under this standard. 2 Randy Hertz and James S. Lieberman, Federal Habeas Corpus Practice and Procedure 1858 (6th Ed. 2011); *see Wiggins*, 539 U.S. at 528 (state court erred in denying claim of ineffective assistance of counsel based on failure to investigate mitigating evidence of prior sexual abuse because court mistakenly assumed that social service records

documented abuse and thus that counsel knew about abuse).

The federal habeas statute extends deferential treatment to a State court's factual findings. Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." A petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

If "the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion," then "a federal habeas court simply reviews the specific reasons given by the [last] state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Therefore, in Petitioner's case, this Court must train its attention on the opinion of the Court of Special Appeals – the last Maryland court to deny Petitioner's federal claim on the merits. *See id.*

## B. Ineffective Assistance of Counsel Standard

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Under this constitutional guarantee, which is applicable to the States through the Fourteenth Amendment, a defendant has the right to "reasonably effective assistance" of counsel. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to establish that he received ineffective assistance of counsel, a petitioner must show that: (1) trial counsel's performance was deficient; and (2) he was prejudiced by counsel's errors. *Id.*

Under the first prong of the test, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional norms." *Id.* at 688. When a court assesses the performance of trial counsel, the court will be "highly deferential." *Id.* at 689. A reviewing court will presume, until proven otherwise, that trial counsel's conduct was

within a broad range of reasonable professional judgment and "might be considered sound trial strategy." *Id.* (citation omitted).

Under the second prong of the test, a petitioner must show that counsel's deficient performance prejudiced the defense. *Id.* at 687. More precisely, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The prejudice prong does not, however, require proof that "counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Such a "preponderance of the evidence" standard need not be met under *Strickland*. *Williams*, 529 U.S. at 405-06. Rather, a petitioner "need only demonstrate that the chances of prejudice were better than negligible." *Julian v. Bartley*, 495 F.3d 487, 500 (7th Cir. 2007). Therefore, the standard for prejudice under *Strickland* "represents a fairly low threshold." *Riggs v. Fairman*, 399 F.3d 1179, 1183 (9th Cir. 2005).

## III.  FACTS

The instant case arose out of a shooting that occurred at Petitioner's home on January 24, 2007. That night, complaining witness Robert White and the decedent, Brandon Clark, delivered furniture to Petitioner's house. After the deliverymen brought a box of bed rails upstairs to the master bedroom, Petitioner, an off-duty police officer who worked for the Prince George's County Police Department, shot White and Clark. Nine days later, Clark died as a result of his injuries.

At Petitioner's criminal trial, White testified that, when he and Clark arrived at Petitioner's home, the deliverymen carried the bed rails upstairs. (T3. 137).[3] After they set down the rails in the

---

[3]  The transcripts of Petitioner's criminal trial will be cited as follows:  the trial date of February 11, 2008, as "T1"; February 12, 2008, as "T2"; February 13, 2008, as "T3"; February 14, 2008, as "T4"; February 15, 2008, as "T5"; February 19, 2008, as "T6"; February 20, 2008, as "T7"; February 21, 2008, as "T8"; and February 25, 2008, as "T9." Petitioner will supplement the record with additional

master bedroom (T3. 164), Petitioner began arguing with Clark.  (T3. 137).  White claimed that Petitioner was upset because the deliverymen had arrived late and he had been waiting all day.  (T3. 137).  White stated that, while Clark was kneeling down by the bed, Petitioner twice ordered Clark to leave the house and pushed him three times.  (T3. 138).  The third time that Petitioner pushed Clark, he fell over on his side.  (T3. 138).  Clark then jumped up and White remarked, "That's it; we out of here."  (T3. 138).  White stepped between Clark and Petitioner, and Clark retreated out of the door, holding up his hands.  (T3. 138, 170).

White testified that, while he had his back to Petitioner and was facing Clark, White heard gunshots.  (T3. 138, 169).  At the time, both deliverymen were outside of the master bedroom.  (T3. 169).  White saw Clark, who had been shot (T3. 169), going backwards, so White caught Clark to prevent him from falling down the stairs.  (T3. 138, 142).

White claimed that, when he turned around, he heard more gunshots and realized that he was hit in the chest and stomach.  (T3. 142).  At the time, Petitioner was standing in front of his bedroom door, and White was on the second or third step from the top of the stairs.  (T3. 163-66).  White then went up the stairs, walked to the end of the hallway on the second floor, and laid down there.  (T3. 143, 167).  Next, Petitioner returned to his bedroom.  (T3. 143).  White alleged that, when he got up, Petitioner exited the bedroom and shot him in the knee.  (T3. 143).

Following the shooting, White was taken to the hospital, where his urine tested positive for cocaine.  (T3. 128).  White denied, however, that he had ever used cocaine.  (T3. 128, 184).  He said he did not know how cocaine got in his urine.  (T3. 128).

Monica Ammann, a DNA analyst, identified White's DNA on Petitioner's gun.  (T4. 123).

---

portions of these transcripts as the Court deems necessary.

Ammann testified that, given the presence of White's DNA, his skin or bodily fluid must have come into contact with the gun.  (T4. 124, 127).  Nevertheless, White maintained that he never fought, struck, or even touched Petitioner.  (T3. 151-52, 180).  White also denied that he touched Petitioner's gun.  (T3. 150).  Furthermore, White maintained that Clark did not hit, have a physical fight with, or even touch Petitioner.  (T3. 151-52).

Other evidence indicated that, contrary to White's story, the deliverymen had physical contact with Petitioner.  Clyde Washington, a volunteer EMS fire captain, stated that he saw "a little swelling in his [Petitioner's] face," while police officer Daren Livingston testified that "it appeared that his [Petitioner's] face was swollen."  (T6. 25, 33).  Leanora Bruni-Conti, a forensic chemist for the Bureau of Alcohol, Tobacco, Firearms, and Explosives, testified that a few polyester fibers, which were recovered from Petitioner's shirt and vest, were consistent with unusual, blue polyester fibers from Clark's pants.  (T6. 125-27).

In contrast to White's account, Petitioner testified that he shot the deliverymen in self-defense.  Petitioner stated that, when the two men entered his home, he led them to the master bedroom.  (T6. 47).  Clark, who was carrying the bed rails, followed behind Petitioner, and White was behind Clark.  (T6. 47).  Next, Petitioner saw Clark enter the bedroom, but Petitioner lost sight of White.  (T6. 47).  When Petitioner asked Clark about White's whereabouts, Clark answered, "I got him, Shorty; I got him," and touched Petitioner's chest area.  (T6. 48).  After Petitioner warned Clark not to do that, Petitioner saw White exit the bedroom of Petitioner's six-year-old daughter. (T6. 48).

Petitioner testified that he asked White what he was doing, but he did not respond.  (T6. 48). Petitioner ordered White to leave Petitioner's daughter's bedroom.  (T6. 48).  Clark then repeated,

"I told you, Shorty, I got him," and again touched Petitioner's chest. (T6. 48). Petitioner said he felt uneasy about the delivery, so three times he ordered the men to leave his house, but they did not do so. (T6. 49-50).

Petitioner walked toward the steps. (T6. 78). White was located near the entrance to Petitioner's bedroom, while Clark and Petitioner were located a couple of feet behind. (T6. 78). When Petitioner got close to White, he punched Petitioner, who was looking at Clark. (T6. 78). White punched Petitioner in the side of his face, and Clark punched him in the back of his head. (T6. 51). Petitioner covered up his head and face to protect himself. (T6. 51-52). While Petitioner was in a crouched position, the deliverymen punched and kicked him in the back of his head, neck, and back. (T6. 52-53). The men beat Petitioner's watch off of his wrist during the assault (T6. 59), which occurred in the upstairs hallway. (*Id.*).

Petitioner's gun was located on his back, concealed under his shirt. (T6. 52). He was concerned that, if the men knocked him unconscious, they could take his gun, and his wife and child still were in the house. (T6. 53, 55). Petitioner testified that he tried to get the men off of him and, eventually, drew his gun and fired. (T6. 53). While Petitioner fired his gun, White and Clark were punching and kicking him. (T6. 54). Petitioner thought that the men would beat him to death because they were much bigger and stronger than him. (T6. 54).[4]

Next, Petitioner stated, he called 911 on a cordless phone and requested ambulances for the

---

[4] Petitioner's testimony that he shot White and Clark while they were beating him is consistent with scientific evidence that Petitioner shot the men at close range. Susan Lee, a firearms and tool mark examiner for the Prince George's County Police Department, stated that she found gunshot residue on Clark's black long-sleeved t-shirt. (T5. 73). Lee determined that the muzzle of Petitioner's gun was located between 12 and 24 inches from Clark's t-shirt when the gun was fired. (T5. 74). Also, Lee observed gunshot residue on White's jeans and concluded, based on chemical tests, that the muzzle of Petitioner's gun was located between three and 12 inches from White's jeans when the gun was fired. (T5. 70).

two men and himself.  (T6. 56).  As a result of the assault, Petitioner's face was swollen, and he felt

pain in his neck, shoulder, back, and top of his head.  (T6. 56).  The first paramedics who responded

to the scene gave Petitioner an ice pack for the swelling.  (T6. 56).  Eventually, paramedics put him

on a collar board and took him to the hospital.  (T6. 57).

Petitioner's wife, Stacey Washington, testified that Petitioner answered the door when the

deliverymen arrived.  (T6. 156).  Stacey Washington and their daughter stayed in the kitchen, eating

dinner.  (*Id.*).  After Stacey Washington heard the door open, she heard people coming inside the

house and walking upstairs.  (*Id.*).  For a while, she heard nothing more.  (T6. 157).  Next, Stacey

Washington heard Petitioner order the men to leave the house.  (*Id.*).  Because she felt that something

was wrong, she got up to find out what was happening.  (*Id.*).  As she walked from the kitchen to the

foyer, she heard a "scuffling kind of noise" and people moving around.  (*Id.*).  She then looked from

the bottom of the stairs at the upstairs hallway.  (T6. 158).

Stacey Washington testified that she saw Petitioner bent over and two men beating him.  (T6.

159).  The men were located on either side of Petitioner.  (T6. 159-60).  She was afraid that they

would beat Petitioner to death because "he was just kind of bent over and he couldn't do anything."

(T6. 159).

Stacey Washington did not, however, climb the steps to help Petitioner.  (T6. 159-60).  She

was afraid that, if something happened to her, then her daughter would be left alone with the two

men.  (T6. 159).  Instead, Stacey Washington decided to call 911.  (T6. 160).  She testified that,

when she stepped back from the stairs, she heard gunshots.  (T6. 162).  She then retrieved her

daughter from the other room, grabbed the phone, and ran out the back door.  (T6. 162).  Next,

Stacey Washington entered the garage, put her daughter in the car, and called 911.  (T6. 163).

Additional facts will be provided below, where necessary.

13

## IV.  STATE COURT FINDINGS

On direct appeal from his convictions, Petitioner alleged, in relevant part, that the trial court erred "in prohibiting [Petitioner] from introducing evidence of the State's only eyewitness's prior convictions for crimes of violence to demonstrate his allegedly violent propensities[.]" *Washington v. State*, 191 Md. App. 48, 57, *cert. denied*, 415 Md. 43 (2010).  The Court of Special Appeals observed that White, the State's sole eyewitness, "had numerous convictions for violent crimes, including pointing a firearm in 1994, assault and battery in 1995, assault with intent to commit sexual conduct in 1995, and domestic violence in 2005." *Id.* at 67-68.

Before trial, the prosecution moved, *in limine*, to exclude these convictions on the ground that they had no bearing on White's honesty and thus were inadmissible for impeachment purposes. *Id.* at 68.  Petitioner's trial counsel sought admission of White's convictions to impeach his credibility and to show bias; counsel failed, however, to offer White's convictions to prove his violent nature or that he was the aggressor.  *Id.*  The trial judge granted the prosecution's motion, excluding from evidence all of White's convictions for violent crimes.  *Id.* at 69.  On direct appeal, the Court of Special Appeals held that, because defense counsel failed to seek admission of White's convictions for violent offenses to prove his violent nature or that he was the initial aggressor, the issue was waived for the purposes of direct review.  *Id.* at 70.

In post-conviction proceedings, Petitioner alleged that "trial counsel provided ineffective representation by failing to argue that [ ] White's convictions for violent crimes were admissible to show that he was the initial aggressor during the incident[.]"  (Exhibit A at 33).  Before the post-conviction court, Petitioner also argued that trial counsel provided constitutionally ineffective representation by failing to offer White's convictions to show his violent propensities.  (Exhibit A at 34 n.8) (concluding, on collateral review, that Petitioner properly preserved issue of admission of

White's convictions to prove his violent nature).

At Petitioner's post-conviction hearing, his trial counsel testified that he was concerned about opening the door to evidence of alleged, prior bad acts by Petitioner. (Exhibit A at 35). Counsel claimed that the prosecution had witnesses who would have testified that Petitioner behaved violently or irrationally on other occasions. (*Id.*) Given counsel's fear that he might open the door to evidence of Petitioner's violent character, the post-conviction court found that counsel did not render ineffective assistance by failing to offer White's convictions for violent crimes to show that he likely was the aggressor in the incident. (See excerpts, which are attached as Exhibit C, from Memorandum Opinion and Order of August 27, 2013, at 25.) The court determined that "[t]he defense made a sound strategic decision not to emphasize White's character for violence as it would open the door to the Defendant's character for violence and the State's rebuttal witnesses, possibly resulting in a less favorable verdict." (Exhibit C at 25).

The post-conviction court also found that Petitioner was not prejudiced. The court speculated, based on the jury's acquittal of Petitioner on charges of second-degree murder and voluntary manslaughter, that it largely discounted White's testimony that Petitioner shot the deliverymen without physical provocation. (*Id.* at 24-25). Rather, the court opined, "the verdict supports the conclusion that the jury did not believe that Petitioner met the elements of a perfect self-defense." (*Id.* at 25).

On appeal from denial of post-conviction relief, Petitioner maintained that his trial counsel provided constitutionally ineffective representation by failing to offer White's convictions to show that he had violent propensities and was the initial aggressor. (Exhibit A at 34). The State responded that counsel's failure to seek admission of White's violent convictions for this purpose was a "tactical decision" in that "counsel did not want to open the door for the State to introduce

15

evidence of appellant's [Petitioner's] character for violence." (*Id.*).  Instead, the State argued, defense counsel focused on challenging White's credibility on cross-examination.  (*Id.* at 35).

The Court of Special Appeals ruled, on collateral review, that trial counsel's "tactical decision" was based on an error of law; in particular, the Court concluded that "**trial counsel misinterpreted [Maryland] Rule 5-404** as permitting the admission of appellant's [Petitioner's] prior violent crimes or acts if appellant [Petitioner] introduced White's prior convictions for the purpose of proving that he was the first aggressor." (Exhibit A at 36) (emphasis added).  The Court emphasized that, based on its review of Rule 5-404(a) at the time of Petitioner's trial, **"it is clear that trial counsel's fear of opening the door** to evidence pertaining to appellant's [Petitioner's] character for violence **was unjustified**." (Exhibit A at 37) (emphasis added).  In other words, under the plain language of the Rule, Petitioner's counsel was allowed to introduce White's violent convictions to show that he had violent propensities and was the aggressor, but the prosecution could not rebut this evidence with proof of Petitioner's alleged violent or irrational acts.  (*See* Exhibit A at 36) ("At the time of appellant [Petitioner's] trial, Maryland Rule 5-404(a) permitted an accused to present evidence attacking a victim's character trait but prevented the prosecution from rebutting such evidence with evidence attacking the accused same character trait.").

Despite this "misinterpretation of Maryland Rule 5-404(a)" by Petitioner's trial counsel, the Court of Special Appeals did not find that counsel performed deficiently.  (Exhibit A at 37-38).  The Court opined that, even though Maryland law barred the State from introducing evidence of Petitioner's violent character to rebut evidence of White's convictions for violent crimes, the trial judge nonetheless "could have accepted such an argument given that the State had a number of witnesses ready to testify for this very purpose." (*See id.* at 38).  The Court concluded:  "We cannot say that trial counsel's desire to avoid even the possibility of the trial court admitting such character

evidence regarding appellant [Petitioner] was unreasonable." (*Id.*).

Lastly, the Court of Special Appeals adopted the post-conviction judge's assessment of prejudice under *Strickland.* The Court speculated, based on the jury's acquittal of Petitioner on charges of second-degree murder and voluntary manslaughter, that it did not credit White's testimony. (Exhibit A at 38-39). "In other words," the Court divined, "the jury's verdict indicated that it believed that White was the initial aggressor but found that appellant did not use a reasonable amount of force in defending himself." (*Id.* at 39). Consequently, the Court concluded that, even if trial counsel performed deficiently, there is no "reasonable probability" that admission of White's convictions to prove his violent nature would have changed the outcome of Petitioner's trial. (*Id.*).

## V.   ARGUMENT

1.   **Trial Counsel Provided Constitutionally Ineffective Assistance By Failing To Introduce Into Evidence Complaining Witness Robert White's Prior Convictions For Violent Crimes To Prove His Violent Nature And That He Was The Aggressor During the Incident.**

In the instant case, Petitioner testified that he shot the furniture deliverymen in self-defense after they violently and repeatedly assaulted him. In contrast, the State's sole eyewitness, Robert White, denied that the deliverymen assaulted Petitioner and maintained that Petitioner shot them in anger while they tried to retreat from his house. Therefore, the jury was called upon to resolve the hotly disputed issues of whether the deliverymen assaulted Petitioner and whether White was the physical aggressor in the incident. Consequently, White's multiple convictions for crimes of violence, including assault with intent to commit sexual conduct, assault and battery, pointing a firearm, and domestic violence, were highly probative of and necessary to a fair resolution of both of these issues. The failure of Petitioner's counsel to introduce this evidence was plainly unreasonable and rendered the outcome of Petitioner's trial unreliable – the overriding concern of

*Strickland.  See Strickland v. Washington*, 466 U.S. 668, 693-94 (1984) (attorney error prejudices

defendant if it "undermines the reliability of the result of the proceeding" such that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different").

On collateral review, the Court of Special Appeals found that Petitioner's trial counsel did

not introduce into evidence White's convictions for violent crimes due to a **mistaken fear – one**

**based on an error of law** – that offering this evidence would allow the State to present rebuttal

evidence of Petitioner's violent character.  (*See* Exhibit A at 36-37) (determining that "**trial counsel**

**misinterpreted Rule 5-404** as permitting the admission of appellant's [Petitioner's] prior violent

crimes or acts if appellant [Petitioner] introduced White's prior convictions for the purpose of

proving that he was the first aggressor") (emphasis added); (concluding that, under Rule 5-404(a)

at time of Petitioner's trial, **"it is clear that trial counsel's fear of opening the door** to evidence

pertaining to appellant's character for violence **was unjustified**") (emphasis added).  Indeed, when

Petitioner was tried, the plain language of Rule 5-404 authorized the State to rebut evidence of

White's violent convictions only with evidence – if any existed – of **White's** character for

peacefulness:

> Evidence of a person's character or a trait of character is not admissible for the
> purpose of proving action in conformity therewith on a particular occasion, except
> . . . [e]vidence of a pertinent character trait of the **victim** of the crime offered by an
> accused or by the prosecution to rebut the same, or evidence of a character trait of
> peacefulness of the **victim** offered by the prosecution to rebut evidence that the
> victim was the first aggressor . . .

Rule 5-404(a)(1)(B) (emphasis added).  Furthermore, evidence of alleged prior bad acts by Petitioner

was inadmissible to prove a violent propensity under Rule 5-404(b) and Maryland case law.  (Exhibit

A at 36); *Sessoms v. State*, 357 Md. 274, 288 (2000).

18

## A.  The Performance Prong of *Strickland*

Despite the fact that Petitioner's counsel failed, based on ignorance of settled law, to introduce evidence of White's violent convictions to show that he violently attacked Petitioner and was the aggressor, the Court of Special Appeals did not find that counsel performed deficiently.  This ruling was both "contrary to . . . clearly established Federal law" and constituted an "unreasonable application" of *Strickland* under 28 U.S.C. § 2254(d)(1) (2019).

First, the ruling by the Court of Special Appeals was "contrary to" Supreme Court decisions concerning the performance prong of *Strickland*.  The Supreme Court has long recognized that, where an attorney commits error due to ignorance of the law, the attorney performs deficiently under *Strickland*.  *See Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (concluding that trial counsel's performance was deficient because he conducted no pre-trial discovery based on "a startling ignorance of the law," which consisted of counsel's "mistaken belie[f] that the State was obligated to take the initiative and turn over all of its inculpatory evidence to the defense"); *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").  Indeed, a duty to keep abreast of clearly established law is at the heart of the *Strickland* performance prong.  *See Strickland*, 466 U.S. at 688 ("Counsel also has a duty to bring to bear such skill and **knowledge** as will render the trial a reliable adversarial testing process.") (emphasis added).  In particular, the "threshold requirements" that attorneys graduate from law school and/or pass a substantive bar examination "are designed to ensure that all new attorneys have learned how to find, understand, and apply legal rules." *See Connick v. Thompson*, 563 U.S. 51, 64 (2011).  Because of attorneys' legal training, they are "equipped with the tools to interpret and apply legal principles, understand constitutional limits,

and exercise legal judgment." *Id.* In Petitioner's case, the finding of the Court of Special Appeals that trial counsel's performance was not deficient even though it was grounded in legal ignorance is "substantially different from the relevant [Supreme Court] precedent." *See Williams*, 529 U.S. at 405.

Moreover, the decision of the Court of Special Appeals was "contrary to" Supreme Court precedent that State trial judges are presumed to know and apply correctly the law. *See Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (emphasizing "presumption that State courts know and follow the law"); *Walton v. Arizona*, 497 U.S. 639, 653 (1990) ("Trial judges are presumed to know the law and to apply it in making their decisions.") Nothing in the trial or post-conviction record suggests that the trial judge was inclined to admit, in violation of the Maryland Rules, alleged evidence of Petitioner's violent character if he introduced White's convictions for violent crimes to prove that White had violent propensities and was the aggressor. Indeed, the judge never was confronted with this issue because Petitioner's trial counsel unreasonably failed to argue that White's violent convictions were admissible for these purposes, and the State never asserted, at trial, that it could properly present rebuttal evidence of Petitioner's alleged prior bad acts. Accordingly, defense counsel's fear that the trial judge would improperly admit such rebuttal evidence came from thin air. Consequently, the Court of Special Appeals contravened federal law by not presuming, in the absence of evidence to the contrary, that the trial judge knew and would have followed Maryland Rule 5-404 and binding case law. (*Compare Visciotti*, 537 U.S. at 24, *with* Exhibit A at 38) ("We cannot say that trial counsel's desire to avoid even the possibility of the trial court admitting such character evidence regarding appellant [Petitioner] was unreasonable."). The failure of Petitioner's trial counsel to introduce White's violent convictions to show his violent nature – evidence that would have tended to exculpate Petitioner – may not be excused on the groundless theory that the

judge might have improperly admitted rebuttal evidence.

Second, the finding of the Court of Special Appeals that trial counsel's performance was not deficient constituted an "unreasonable application" of *Strickland* under 28 U.S.C. § 2254(d)(1). The Supreme Court has consistently held that, where a defense attorney's decision is based on an unreasonable mistake of law, such a decision constitutes deficient performance and may not be justified as "strategy." *See Kimmelman*, 477 U.S. at 385 (counsel's failure to file timely suppression motion was unreasonable because he was unaware, until first day of trial, of search of Respondent's apartment and seizure of bed sheet due to counsel's failure to conduct discovery based on his "startling ignorance of the law"); *id.* ("Counsel's failure to request discovery, again, was not based on 'strategy,' but on counsel's mistaken beliefs [about the law]"). *See also Williams*, 529 U.S. at 395 (counsel performed deficiently by failing to conduct investigation that would have produced records of defendant's "nightmarish" childhood "not because of any strategic calculation, but because [counsel] incorrectly thought that state law barred access to such records"); *Hinton*, 134 S. Ct. at 1089 (holding that trial counsel's "inexcusable mistake of law" constituted ineffective assistance where counsel's "unreasonable failure to understand the resources that state law made available to him . . . caused counsel to employ an expert that *he himself* deemed inadequate") (emphasis in original).

Like in *Hinton*, Petitioner's trial counsel was ignorant of "a point of law that was fundamental to his case." *See Hinton*, 134 S. Ct. at 1089. Counsel's theory was that Petitioner acted in self-defense, yet counsel did not know that introducing White's convictions for violent crimes to show that he had a violent nature would **not** open the door to evidence of Petitioner's violent character. Counsel's ignorance of Maryland law concerning the admission of a witness's other crimes in a self-defense case is a "quintessential example of unreasonable performance under

21

*Strickland*." *See Hinton*, 134 S. Ct. at 1089.

The Fourth Circuit is in accord that, under the performance prong of *Strickland*, a trial attorney provides deficient representation if he fails to act due to ignorance of settled law. *See Glover v. Miro*, 262 F.3d 268, 276 (4ᵗʰ Cir. 2001) (finding deficient performance where attorney failed to contact certain potential alibi witnesses because "he did not realize that a South Carolina statute allowed criminal defendants to compel the attendance of out-of-state witnesses necessary for the defense" and where attorney did not know that maximum sentence for kidnaping in South Carolina had been amended from life to 30 years); *Alston v. Garrison*, 720 F.2d 812, 817 (4ᵗʰ Cir. 1983) (granting habeas relief on ground of ineffective assistance of counsel where trial counsel failed to oppose admission of defendant's post-arrest silence even though, since Supreme Court's decision in *Doyle v. Ohio*, 426 U.S. 610 (1976), "the law has been clear that admitted evidence of post-arrest silence violates due process of law"). The Ninth Circuit has applied the performance prong of *Strickland* in the same manner when an attorney's decision is based on an error of law. *United States v. Span*, 75 F.3d 1383, 1389-90 (9ᵗʰ Cir. 1996) (holding that claim of "trial strategy" will not protect counsel's performance from Sixth Amendment challenge when "strategy" resulted from misunderstanding of the law).

In Petitioner's case, the application of the performance prong of *Strickland* by the Court of Special Appeals was objectively unreasonable because the State court:   (1) misapplied the performance prong to a different set of facts, *see, e.g., Kimmelman*, 477 U.S. at 385; and (2) "fail[ed] to give appropriate consideration and weight to pertinent facts" in light of the legal standard.  2 Randy Hertz and James S. Lieberman, Federal Habeas Corpus Practice and Procedure 1795 (6ᵗʰ ed. 2011). *See, e.g., Porter v. McCollum*, 130 S. Ct. 447, 454 (2009) (*per curiam*) (Florida Supreme Court unreasonably concluded that defendant was not prejudiced by his attorney's failure to conduct

22

adequate investigation because Court "did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing").  In particular, the Court of Special Appeals did not properly consider and accord sufficient weight to the pivotal fact that the decision by Petitioner's trial counsel not to introduce White's violent convictions to show that he had a violent nature and was the aggressor resulted from counsel's ignorance of settled law.  Counsel's misinformed failure to offer reliable and compelling evidence concerning White's violent criminal history cannot reasonably be justified as "strategy."  *See White v. McAninch*, 235 F.3d 988 (6th Cir. 1999) (observing that "even deliberate trial tactics may constitute ineffective assistance of counsel if they fall outside the wide range of professionally competent assistance") (quoting *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984)).

Similarly, the Court of Special Appeals assigned inadequate weight to the fact that Petitioner's trial counsel "sought admission of **all** of White's prior convictions," including his convictions for violent crimes (Exhibit A at 37) (emphasis added), but failed to offer the violent convictions to show that White had violent propensities and was the aggressor – the only purposes for which those convictions were admissible.  In other words, trial counsel wanted to secure admission of White's violent convictions, but was afraid to do so because of counsel's ignorance of the law.  Therefore, although "[c]ounsel's trial strategy was to focus on attacking White's credibility" in various ways (Exhibit A at 38), counsel did not make an **informed** choice to challenge White's truthfulness instead of offering evidence of his violent propensities.  Moreover, counsel's cross-examination of White to show his **untruthfulness** did not excuse counsel's failure to present evidence of White's **violent nature**, which would have served an entirely different and more important purpose – to establish that Petitioner was violently assaulted, placed in reasonable fear for his life, and forced to defend himself.

23

The decision by the Court of Special Appeals in this case is inconsistent with precedent of Maryland's highest court – the Court of Appeals, which has applied the performance prong of *Strickland* in the same manner as the Supreme Court and the Fourth Circuit when trial counsel's performance is rooted in an error of law.   *See Coleman v. State*, 434 Md. 320, 338-39 (2013) (finding deficient performance based on trial counsel's admission that he did not know he could object to detective's testimony about defendant's post-*Miranda* silence).   In *Coleman*, the Court of Appeals concluded that, because counsel's failure to object resulted from his unawareness of the law, counsel's performance did not qualify as "sound trial strategy."   *Id.* at 338 ("We do not see how trial counsel's failure to object because of his **ignorance of the law** could possibly be seen as sound trial strategy or a strategic choice.") (emphasis added).   *See also id.* at 339 (where trial counsel conceded that he did not know applicable law, his omission did "not indicate any particular trial strategy founded upon 'adequate investigation and preparation' . . .") (quoting *State v. Borchardt*, 396 Md. 586, 604 (2007) (noting that, "[b]efore deciding to act, or not to act, counsel must make a rational and informed decision on strategy and tactics based upon adequate investigation and preparation").

Lastly, in Petitioner's case, the application of *Strickland* by the Court of Special Appeals is inconsistent even with its own precedent, which establishes that an attorney is ineffective if he decides not to introduce material evidence due to ignorance of the law.   *See State v. Peterson*, 158 Md. App. 558, 857 A.2d 1132, 1154 (2004) (holding that trial counsel provided ineffective assistance where decision not to introduce evidence of battered spouse syndrome resulted from "counsel's not being adequately familiar with the law").

## B.  The Prejudice Prong of *Strickland*

The central issues at trial were whether the furniture deliverymen assaulted Petitioner, repeatedly punching and kicking him, and whether the deliverymen were the physical aggressors.

Petitioner testified that deliveryman Robert White initiated the violent encounter, punching Petitioner in the side of his face, while deliveryman Brandon Clark punched Petitioner in the back of his head.  Next, both deliverymen repeatedly punched and kicked Petitioner as he tried to cover up his head and face.  Petitioner asserted that he feared for his life and ultimately shot the deliverymen in self-defense.  In contrast, White, the State's only eyewitness, maintained that the deliverymen never assaulted Petitioner and that Petitioner shot them in anger as they attempted to retreat from his house.

Given that the outcome of the trial turned primarily on credibility determinations – whether the jury believed Petitioner's testimony or White's account – there clearly is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See Strickland*, 466 U.S. at 694.  If trial counsel had not failed, based on his ignorance of the law, to introduce into evidence White's multiple convictions for violent crimes, the jury would have learned that White had a long history of violence and thus likely attacked and violently assaulted Petitioner, as he testified.  The finding by the Court of Special Appeals that Petitioner did not suffer prejudice is objectively reasonable because the introduction of White's violent convictions would have dramatically changed the evidentiary picture, casting doubt on White's story that he never assaulted Petitioner while lending credence to Petitioner's testimony that White attacked him.

In closing argument, the prosecution contended that Petitioner shot the deliverymen in anger because they delivered his furniture late.  (Exhibit B at 61, 132).  Consistent with White's story that the deliverymen did not assault Petitioner, the prosecution argued that Petitioner was not injured during the incident.  The prosecution relied on police photographs, which were taken after the

shooting, that did not show obvious injuries to Petitioner's face (*id.* at 50)[5], as well as testimony by a physician who examined Petitioner at the hospital following the incident and did not document visible trauma to his head or face. (*Id.* at 140).[6] In summary, the prosecution's theory of the case was that Petitioner shot the deliverymen in anger and that they did not assault him. (*Id.* at 132).

Contrary to the decision of the Court of Special Appeals, the jury's verdict did not establish that it disbelieved White's testimony and found that he was the aggressor, but concluded that Petitioner used excessive force. (*See* Exhibit A at 38-39). Rather, the jury instructions, which the jury is presumed to have followed, show that the jury found Petitioner guilty of first-degree assault of Clark based on a determination that Petitioner "intended to cause serious physical injury" (Exhibit B at 26) – a *mens rea* that is consistent with a finding that Petitioner shot the deliverymen in anger and without physical provocation, as the prosecution theorized. The Court of Special Appeals seized on the jury's acquittal of Petitioner on charges of second-degree murder and voluntary manslaughter, but those offenses require a more culpable mental state of an "intent to kill" or an "intent to inflict such serious bodily harm that death would be the likely result" (Exhibit B at 27). Therefore, it is probable that the acquittal of Petitioner on those greater charges indicates only that jury was not satisfied that he harbored a more elevated *mens rea*. The Court of Special Appeals, in trying to divine special findings about White's credibility and Petitioner's claim of self-defense from the

---

[5] Shortly after the incident, Petitioner was treated by emergency medical personnel and an ice pack was applied to his face. (T5. 129). Accordingly, his injuries probably were less visible later in police photographs.

[6] The physician acknowledged, however, that she treated Petitioner for a neck strain and contusion. (T5. 116). She agreed that a contusion can be considered trauma. (T5. 116). Based on the tenderness that Petitioner had in his face, the physician found soft tissue injuries in those areas. (T5. 117). Consequently, she prescribed prescription-strength Motrin and Vicodin, a narcotic, for "moderate pain." (T5. 117-18).

jury's general verdict, engaged in wild speculation and thus applied the prejudice prong of *Strickland* in an objectively unreasonable manner.

Finally, there also is a reasonable likelihood that the jury reached a compromise verdict and convicted Petitioner of lesser charges. *See Dionas v. State*, 436 Md. 97, 80 A.3d 1058, 1067 (2013) (stating, in the context of harmless-error analysis, that court should consider factors including "the possibility of a compromise verdict"). Specifically, jurors might well have been unable to agree on whether Petitioner shot the deliverymen without provocation or the deliverymen attacked Petitioner, placing him in reasonable fear for his life and forcing him to act in self-defense. Consequently, there is a "reasonable probability" that, but for trial counsel's failure to introduce White's violent convictions to show that he had violent propensities and likely was the aggressor, a unanimous jury would have credited Petitioner's testimony and "the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694.

## VI.  CONCLUSION

For all of the above reasons, Petitioner requests that this Court vacate his convictions, grant him a new trial, and grant such other and future relief as law and justice might require.

Respectfully submitted,

_____/s/_____
Daniel H. Ginsburg, Bar No. 24223
The Law Office of Daniel Ginsburg, LLC
One Research Court, Suite 450
Rockville, Maryland 20850
301.519.8014
danielginsburglaw@gmail.com

Counsel for Petitioner

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this _____7th_____ day of June, 2019, a copy of the foregoing Memorandum In Support Of Petition Under 28 U.S.C. § 2254 For Writ Of Habeas Corpus By A Person In State Custody was delivered electronically and/or by United States Postal Service Priority Mail, postage prepaid, to the Maryland Office of the Attorney General, Criminal Appeals Division, 200 St. Paul Place, Baltimore, Maryland, 21202.


_____/s/_____
Daniel H. Ginsburg